T.C. Memo. 1997-464


UNITED STATES TAX COURT


ALPHA MEDICAL, INC., f.k.a. ALPHA MEDICAL MANAGEMENT, INC.,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22802-94.              Filed October 14, 1997.


John P. Konvalinka and Thomas E. Smith, for petitioner.

Bonnie L. Cameron, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARR, Judge:  Respondent determined a deficiency in

petitioner's 1990 Federal income tax of $1,376,520, and a penalty

under section 6662[1] of $275,304.

_____

[1]  All section references are to the Internal Revenue Code
as in effect during the year in issue, and all Rule references
are to the Tax Court Rules of Practice and Procedure, unless
otherwise indicated.  All dollar amounts are rounded to the
nearest dollar unless otherwise indicated.

The issues for decision are: (1) Whether an amount paid by petitioner to William T. Rogers (Rogers) as compensation during taxable year 1990 is reasonable within the meaning of section 162(a)(1). We find the amount paid was not reasonable to the extent set out below. (2) Whether petitioner is liable for the accuracy-related penalty under section 6662(d) for substantially understating its income for the year in issue.[2] We find it is.

---

[2] In its petition to this Court, petitioner raised the issue of whether a second inspection of petitioner's records, within the meaning of sec. 7605(b), was conducted by respondent's agent for the 1990 taxable year.

On Jan. 5, 1993, petitioner received a notice of audit for 1990. Upon receipt of the notice of audit for 1990, petitioner objected to the audit on the basis that the audit was repetitive and that the Internal Revenue Service (IRS) already had in its possession information relating to 1990.

Revenue Agent Arthur W. Horton caused a summons to be issued for information relating to 1990. By letter dated Nov. 18, 1993, petitioner informed the IRS that petitioner was not going to produce the records.

A summons enforcement proceeding was initiated in the U.S. District Court for the Eastern District of Tennessee on June 20, 1994, and a hearing was held on Aug. 29, 1994. Petitioner's representative appeared at the hearing and objected to the summons on the ground, inter alia, that the IRS's request to examine its books of account for 1990 was a second inspection in violation of sec. 7605(b). The District Court ruled in favor of the IRS, and petitioner appealed to the Court of Appeals for the Sixth Circuit.

In United States v. Alpha Med. Management, Inc., 116 F.3d 1481 (6th Cir. 1997), the Court of Appeals for the Sixth Circuit by an unpublished opinion remanded the case to the District Court for a determination of which documents sought by the summons were already in the possession of or accessible to the IRS. In other respects the District Court's order enforcing the summons was affirmed. In its ruling, the Court of Appeals found that the IRS complied with the statutory requirements of sec. 7605(b).

We conclude that there was no second inspection of petitioner's books of account in violation of sec. 7605(b).

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulated facts and attached exhibits are incorporated herein by this reference.

A. Petitioner's Background

Alpha Medical Management, Inc., also known as Alpha Medical, Inc. (hereinafter petitioner), is a medical management corporation duly formed and organized under the laws of Tennessee. At the time the petition was filed, its principal place of business was in Chattanooga, Tennessee. Rogers incorporated petitioner in 1982, with an initial capital contribution of $1,000. He has not made any additional capital contributions to petitioner. Petitioner began operations on January 1, 1986. By 1990, petitioner had 60 employees.

Petitioner provides medical management services to home health care agencies and hospitals with home health care departments. Home health care agencies are subject to State licensing requirements and requirements known as Certificate of Need. The services petitioner provides to its clients are tailored to meet each client's individual needs and to assist each client in complying with the various licensing requirements, Certificate of Need requirements, and the various Medicare and Medicaid regulations. In most instances, petitioner's services include the management of four categories of operations: (i) Reimbursement, (ii) accounting, (iii) accounts receivable,

billing, and computer operation, and (iv) clinical/ operational/consulting.

Petitioner's entire operation is located in one office in Chattanooga, Tennessee. Petitioner's clients' locations grew from 1 in 1986 to 60 in 1992 in Tennessee, Kentucky, Arkansas, and Florida. In 1990, petitioner managed 43 locations. B.

William T. Rogers' Background and Duties

Since petitioner began operations in 1986, Rogers has been its president, sole director, and sole shareholder. Rogers worked 12 hours a day and was available at all times of the day by telephone or pager. During and prior to 1990, Rogers made all decisions that affected petitioner's mid- and long-range plans, and Rogers handled any problems that arose with petitioner's clients or employees. Rogers did not routinely deal with petitioner's day-to-day operations or with the day-to-day care of patients. Until sometime in 1990 or 1991, Rogers negotiated each contract petitioner made with its clients.

Rogers has a bachelor of science in biology from Tennessee Technological University and a doctorate in pharmacy from the University of Tennessee. He has more than 25 years of experience in the health care field. Rogers was the founder of a successful, local drugstore chain with seven stores which he sold in 1986. Rogers also began a durable medical equipment business which he sold to a publicly traded company in 1984. When Rogers sold the durable medical equipment business, he was offered a

million-dollar-plus salary to manage National Medical Equipment California Home Health Care Division. Rogers turned down that job offer because he did not want to move to California.

C. Petitioner's Divisions and Management Team

1. The Financial Division

Petitioner is divided into two divisions: The financial division and the clinical and operations division. The financial division provides a complete array of accounting services for petitioner's clients, including the review of each client's expenditures to insure that they are reimbursable by Medicare. Rayburn H. Tankersly (Tankersly), a certified public accountant, has been petitioner's senior vice president of finance and chief financial officer in charge of the financial division since October 1988, when he began working for petitioner. Tankersly has been in the medical accounting field since 1969. Tankersly was hired, in part, to help Rogers make technical decisions dealing with Medicare regulations. Tankersly provides strategic focus for petitioner's financial division. He assists in strategic planning for clients, develops and maintains client relationships, provides financial guidelines to clients, and ensures proper staffing for the financial division. Tankersly worked 10 to 12 hours a day in 1990.

Tim Stees (Stees), a certified public accountant, has been petitioner's vice president of finance since late 1989. Stees coordinates tax return preparation, participates in strategic

planning for petitioner and its clients, and develops and maintains client relationships. During 1990, Stees was the controller, in addition to being responsible for supervising various functions of the payroll and accounts payable departments.

Petitioner's reimbursement and information systems departments are part of petitioner's financial division. From 1987 to 1990, Libby Walker (Walker) was petitioner's director of reimbursement. Walker dealt with the Commerce Clearing House (CCH) guides, the Health Insurance Manual-11 (HIM-11), all the Government rules, and Medicare regulations.

2. The Clinical and Operations Division

The operations division provides surveys, advice, and evaluations for petitioner's clients and develops the operational and clinical products that are delivered to clients. Rebecca Worley (Worley), a registered nurse, has been petitioner's senior vice president of operations and chief operations officer since petitioner's inception in 1986. Worley provides strategic focus for petitioner's operations division. She (1) decides the direction and timing of client selection and development, (2) translates Rogers' management vision into operational plans, (3) is responsible for marketing services and petitioner's development, (4) ensures proper staffing levels and training programs, (5) guides clients regarding the direction and actions of their companies, and at one time, (6) oversaw and assisted in

the development of petitioner's clinical information system. From 1986 through 1990, Worley worked 10 to 12 hours a day for petitioner. Worley directs the nurses petitioner employs.

Donna Stapleton (Stapleton), a registered nurse, is petitioner's vice president of operations. Stapleton earned a Certification in Nursing Administration in 1985 from the American Nursing Association. She is responsible for the operational and clinical oversight of the field staff, acts as a liaison with State and Federal fiscal intermediaries regarding regulatory issues, provides evaluations and advice to clients, and handles personnel management, development, and recruitment.

Currently, petitioner has three senior consultants with nursing backgrounds in its operations division. Each senior consultant, along with Stapleton, supervises a team of two to four nurses. Before the senior consultants were hired sometime after 1990, these duties were performed under Rogers' guidance.

3. Petitioner's Management Team--General

From 1986 to 1988, petitioner's management tasks were performed by Rogers and Worley. In late 1988, Tankersly joined, and in late 1989, Stees joined petitioner's management team. Rogers, Tankersly, and Worley knew petitioner's business; Rogers had the reputation that brought the clients in and finalized the contracts. Sometime in 1990 or 1991, a salesman began working for petitioner out of Nashville. Rogers recruited petitioner's executive and management staff.

Rogers, Tankersly, and Worley attended State and national home care association meetings, entertained and recruited clients, visited exhibit halls to see what vendors were offering, and shared the information they obtained with each other.  In 1990, petitioner's board of directors included:  Rogers, president/CEO; Tankersly, vice president/CFO; and Worley, executive vice president/secretary.

D.  Petitioner's Services

Petitioner provides its clients with a team of employees who have advanced skills and knowledge in dealing with Medicare and Medicaid regulations.  The team conducts a mock survey to determine whether the clients are in compliance with State licensing, Federal conditions of participation, and the rules of other accrediting bodies and recommends ways to comply or improve.  Rogers developed the parameters for the mock survey team and, together with Worley, developed the product line for the mock survey.  The mock survey replicates the annual inspection required by State and Federal regulatory authorities, and as a result of the mock survey, petitioner's clients have exceptional records with respect to their inspections.

Petitioner has policy manuals that discuss petitioner's products and explain how services are to be provided to its clients.  The policy manuals are periodically revised.  By 1989, petitioner had 8 policy manuals, and by 1992 petitioner had 11

policy manuals.  Rogers helped develop most, if not all, of petitioner's policy manuals.

During 1989 and 1990, there was a nursing shortage.  Rogers worked with an advertising firm to develop a recruitment plan to help petitioner's clients recruit adequate staffs.  Rogers developed the per-visit method of compensation for nurses and recommended its use to petitioner's clients, which increased the availability of nurses.

Rogers also suggested developing the Alpha Information System, a clinical system that provides documentation and assistance to the clinician providing the services and reduces paperwork.  The use of the Alpha Information System enhances the quality of patient care by allowing the nurse to spend more time on patient care and less time on documentation and ensures accuracy.  There were no other computer systems like it in the home health care industry in 1990.  Rogers drew the schematics about how home health care works for petitioner's computer programmers, who then developed the system.

Petitioner's clients have to attend Medicare preexit and exit conferences to determine whether Medicare agrees with the amounts the clients were reimbursed for.  At preexit conferences Medicare informs the client of proposed adjustments and items that may be disallowed.  At exit conferences, the clients present explanations for the items Medicare proposed to adjust.  If an item is disallowed, the client has to reimburse Medicare what

Medicare paid the client.  During the years 1986 through 1990, Rogers attended all of petitioner's clients' Medicare preexit and exit conferences and vigorously defended their positions. Usually a second employee of petitioner attended the conferences with Rogers.

E.  Petitioner's Key Employees' Compensation

Petitioner awards bonuses to almost all of its employees, both management and nonmanagement.  Bonuses are based upon contributions to petitioner's overall profit and employee performance.  For the years 1988, 1989, and 1990, petitioner paid its key employees (other than Rogers) the following compensation amounts:

| Employee | 1988 | | | 1989 | | | 1990 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Salary | Bonus | Total | Salary | Bonus | Total | Salary | Bonus | Total |
| Worley | $36,838 | $32,500 | $69,338 | $36,838 | $90,000 | $126,838 | $36,838 | $190,000 | $226,838 |
| Tankersly | 10,417 | 2,500 | 12,917 | 50,000 | 57,500 | 107,500 | 50,000 | 165,000 | 215,000 |
| Walker | 36,838 | 23,000 | 59,838 | 36,900 | 46,500 | 83,400 | 35,000 | 50,000 | 85,000 |
| Frazier | 35,006 | 7,500 | 42,506 | 35,000 | 22,500 | 57,500 | 35,000 | 32,500 | 67,500 |
| Goodwin | --- | --- | --- | 17,500 | 10,000 | 27,500 | 35,000 | 31,500 | 66,500 |
| Stees | --- | --- | --- | 12,250 | 10,000 | 22,250 | 42,000 | 20,000 | 62,000 |

In 1990, Rogers determined the amounts of the bonuses.

F.  Rogers' Compensation

During the years 1986 through 1990, Rogers determined how much petitioner paid him.  For those years, Rogers gave himself a base salary, plus a bonus based on a percentage of petitioner's pretax profit as follows:

| Year | Base Salary | Bonus |
|------|-------------|-------|
| 1987 | $75,000 | 25% of pre-tax profit |
| 1988 | 300,000 | 25% of pre-tax profit |
| 1989 | 500,000 | 50% of pre-tax profit |
| 1990 | 1,000,000 | 50% of pre-tax profit |

Rogers' salary and bonus percentage were reflected in petitioner's corporate minutes at the beginning of each year. For 1990, Rogers gave himself a large base salary increase ($500,000 to $1 million) to compensate himself for turning down the 1984 California job offer. For 1986 through 1990, Rogers' compensation compared to the total paid to other employees, petitioner's taxable income, petitioner's gross receipts, and the percentage of gross receipts which his compensation made up was as follows:

| Year | Rogers' Compensation | Other Employees | Taxable Income | Gross Receipts | % of Gross Receipts |
|------|----------------------|-----------------|----------------|----------------|---------------------|
| 1986 | $66,943 | $220,273 | $138,012 | $848,403 | 7.8 |
| 1987 | 75,914 | 317,562 | 240,063 | 1,196,849 | 6.0 |
| 1988 | 431,702 | 595,141 | 620,313 | 2,542,912 | 16.9 |
| 1989 | 928,883 | 1,054,281 | 1,743,853 | 4,993,761 | 18.6 |
| 1990 | 4,439,180 | 1,636,264 | 2,432,253 | 9,880,760 | 44.9 |

During the years 1986 through 1990, petitioner did not have pension plans or other forms of deferred compensation for Rogers or other key employees. Petitioner paid dividends to Rogers, its sole shareholder, of $1,000 in 1989, $1,500 in 1990, and $5,500 in 1991. Rogers is the only person who had authority to declare

dividends for petitioner.  For the years 1986 through 1990, petitioner's retained earnings were as follows:

| Year | Retained Earnings |
|------|-------------------|
| 1986 | $96,623 |
| 1987 | 247,338 |
| 1988 | 649,000 |
| 1989 | 1,707,137 |
| 1990 | 3,388,705 |

G.  Petitioner's Audits

On December 4, 1990, petitioner received a notice of audit for 1989 (the 1989 audit).  The 1989 audit continued until December 4, 1992.  During the 1989 audit of petitioner, the Internal Revenue Service (IRS) analyzed the issue of the deductibility of compensation paid to Rogers and obtained information relating to the calculation of compensation in both 1989 and 1990, including the amount of compensation petitioner paid Rogers, and petitioner's 1990 tax return.  Petitioner paid Rogers $928,883 of compensation in 1989 and $4,439,180 in 1990.  Respondent allowed $400,000 as a deduction for reasonable compensation.

OPINION

Issue 1.  Whether the Amount Paid by Petitioner to Rogers as Compensation During Taxable Year 1990 Is Reasonable Within the Meaning of Section 162(a)(1)

Section 162(a)(1) allows a corporation to deduct as a business expense "a reasonable allowance for salaries or other compensation for personal services actually rendered".  To come within the ambit of section 162(a)(1), the compensation must be

both:  (1) Reasonable in amount, and (2) paid purely for services rendered to the corporation.  Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), affg. T.C. Memo. 1973-130; sec. 1.162-7(a), Income Tax Regs.  It is clear that bonuses may be part of the allowable deductions as long as the sum of the base pay and the bonuses does not exceed a reasonable compensation.  Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 605 (9th Cir. 1968), affg. T.C. Memo. 1967-7; sec. 1.162-9, Income Tax Regs.[3]  Neither party has suggested that Rogers did not render valuable services to petitioner.  Accordingly, we will focus on the first element of the deductibility test--whether the amounts of the payments were reasonable.

Whether the compensation is reasonable is a question to be resolved on the basis of an examination of all the facts and circumstances of the case.  Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 118 (6th Cir. 1949), revg. a Memorandum Opinion of this Court; Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992).  Respondent's determination is presumed correct, and

---

[3]  Sec. 1.162-9, Income Tax Regs., provides in part:

Bonuses to employees will constitute allowable deductions from gross income when such amounts are made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed reasonable compensation for the services rendered. * * *

petitioner bears the burden of proving the reasonableness of the compensation.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  If petitioner proves respondent's determination to be wrong, the Court must then decide the amount of compensation that was reasonable.  <u>Pepsi-Cola Bottling Co. v. Commissioner</u>, 61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975).

In addressing the reasonableness of compensation, the Court of Appeals for the Sixth Circuit, the court to which an appeal in this case lies, has adopted a set of basic factors that should be considered by the Court in reaching its decision:  (1) The employee's qualifications; (2) the nature, extent, and scope of the employee's work; (3) the size and complexities of the employer's business; (4) a comparison of salaries paid with the employer's gross and net income; (5) the prevailing general economic conditions; (6) a comparison of salaries paid with distributions of retained earnings; (7) the prevailing rates of compensation for comparable positions in comparable concerns; (8) the salary policy of the employer as to all employees; and (9) in the case of small corporations with a limited number of officers, the amount of compensation paid to the particular employee in previous years.  <u>Mayson Manufacturing Co. v. Commissioner</u>, <u>supra</u>; see also <u>Home Interiors & Gifts, Inc. v. Commissioner</u>, 73 T.C. 1142, 1155-1156 (1980).  The situation must be considered as a

whole with no single factor decisive.  Mayson Manufacturing Co. v. Commissioner, supra.

In analyzing these factors, the Court must carefully scrutinize the facts of a case in which the paying corporation is controlled by an employee to whom the compensation is paid.  For example, section 1.162-7(b)(1), Income Tax Regs., cautions that in the case of a corporation having few shareholders, "An ostensible salary paid by a corporation may be a distribution of a dividend on stock."  See Estate of Wallace v. Commissioner, supra at 555.  In such a situation, we must be convinced that the purported compensation was paid for services rendered by the employee as opposed to a distribution of earnings to him that the employer could not deduct.  RTS Inv. Corp. v. Commissioner, 877 F.2d 647, 650 (8th Cir. 1989), affg. per curiam T.C. Memo. 1987-98; Seven Canal Place Corp. v. Commissioner, 332 F.2d 899 (2d Cir. 1964), remanding T.C. Memo. 1962-307.

1.  Rogers' Qualifications

An employee's superior qualifications for his or her position with the business may justify high compensation.  See, e.g., Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, 59 T.C. 338, 352-353 (1972).

Although Rogers had no formal training in business management, he has more than 25 years of practical business

experience in the health care industry.  Furthermore, Rogers developed a single drugstore into a chain of stores that he sold in 1986 and a hospital supply business that he sold to a publicly traded company in 1984.

Rogers was instrumental in developing petitioner's computer software programs, mock surveys, and policy manuals, solving its staffing problems, and developing cost-efficient operating procedures.  Petitioner's success is mainly attributable to Rogers' ambition, creativity, vision, and energy, not to its investment in capital.  See Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, supra.  This factor favors petitioner.

2.  Nature, Extent, and Scope of Rogers' Work

An employee's position, hours worked, duties performed, and general importance to the success of a business may justify high compensation.  Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158.  In this case, the history of Rogers' contributions to petitioner must be considered, rather than just his contributions during the year at issue, because the compensation petitioner paid to him during the year at issue represents, in part, an attempt to rectify prior undercompensation.  (See our discussion under factor 9, infra.)

At one time or another since its inception, Rogers has held most of the management positions at petitioner.  He has

consistently worked 12 hours each day in the office and is on call 24 hours a day. Rogers' responsibilities have covered a wide range of activities, including sales, personnel, operations, finance, planning, and flying the corporate airplane.

The record shows that no other officer of petitioner has the breadth of experience with the company which Rogers has. However, his experience has not been a solitary one; he has been assisted by a hard-working and well-qualified management team, and in particular by Worley.

By any reasonable measure, Rogers' efforts on behalf of petitioner have been highly successful. Petitioner's profitability is attributable to sales of its services and effective cost containment. "Getting and keeping customers is, of course, the lifeblood of any business". Kennedy v. Commissioner, 671 F.2d 167, 176 (6th Cir. 1982), revg. 72 T.C. 793 (1979). Rogers is petitioner's primary salesman and deal closer; he personally obtained each of petitioner's clients and negotiated each contract petitioner made with its clients.[4]

Since 1986, petitioner's gross receipts have increased almost 12 times, taxable income has increased almost 18 times, and net worth has shown an increase of over 35 times. See Home

---

[4] We note, however, that Tankersly and Worley also entertained and recruited clients, and since 1989, Stees' responsibilities have included developing and maintaining client relationships.

Interiors & Gifts, Inc. v. Commissioner, supra at 1157-1158
(extraordinary corporate performance is evidence that officer's
compensation is not excessive); see also Kennedy v. Commissioner,
supra; cf. National Cottonseed Prods. Corp. v. Commissioner, 76
F.2d 839 (6th Cir. 1935) (poor performance did not justify
compensation paid), affg. in part and revg. in part 28 B.T.A. 67
(1933).  Furthermore, the 1990 gross receipts were 98 percent
greater than the 1989 receipts, yet expenses increased by only 27
percent.  Petitioner's successful cost containment is
attributable in part to innovative management programs which were
developed by Rogers and Worley.

Significantly, petitioner increased its business and revenues
during a time of a nursing shortage.  Petitioner's ability to
increase its business while presented with a restricted labor
force was due in part to petitioner's use of an innovative
compensation plan for the nurses and the use of the drug
interaction system.  The compensation plan and the drug
interaction system were both developed in part by Rogers.  This
factor favors petitioner.

3.  Size and Complexities of Petitioner's Business

Petitioner's gross receipts--an indicator of its size--were
$9,880,760 in 1990.  From 1986 to 1990, the number of employees
at petitioner increased from 2 (Rogers and his wife) to 60, and
the number of client locations increased from 1 to 43, which

included locations in the States of Tennessee, Kentucky, Arkansas, and Mississippi. Moreover, approximately 30 percent of the increase in client locations occurred from 1989 to 1990. Finally, the home health care visits managed by petitioner in 1990 almost doubled from the 500,000 managed in 1989. Thus, petitioner's business dramatically increased in 1990 compared to 1989.

Petitioner is in a complex business. The management of the home health care business requires special expertise with regard to Medicare, Medicaid, insurance requirements, and State health care licensing regulations. In addition to technical expertise, compliance with the various insurance programs requires accurate documentation of each home visit. Petitioner managed the documentation and reporting of almost a million home health care visits in 1990. The documentation and reporting of these visits included both clinical information and claims information which were processed through the Alpha Information System that was designed in part by Rogers and Worley and implemented by Rogers. This factor favors petitioner.

4. Comparison of Salaries Paid to Gross and Net Income

In 1990, Rogers' compensation was 44.9 percent of petitioner's gross receipts and 64.6 percent of its net taxable

income (before deduction of Rogers' compensation).[5]  Although it is often helpful to consider compensation as a percentage of both gross receipts and net income, the latter is in most cases more probative, because it more accurately gauges whether a corporation is disguising the distribution of dividends as compensation.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325-1326 (5th Cir. 1987), affg. T.C. Memo. 1985-267. However, as noted previously, each case turns on its own facts and circumstances, and no particular ratio between compensation and gross or net taxable income is a prerequisite for a finding of reasonableness.

Petitioner cites several cases in which this Court found that the compensation paid was reasonable notwithstanding the fact that the compensation was a large portion of the taxpayer's gross and net income.  See, e.g., Pulsar Components Intl., Inc. v. Commissioner, T.C. Memo. 1996-129 (reasonable compensation was 27.3 percent of gross receipts of $10,693,635 and 82.4 percent of $3,546,647 taxable net income (before deduction of the compensation at issue) in 1985); Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153 (reasonable compensation was 34, 28, and 38 percent of gross receipts of $2,554,942,

_____

[5]  In 1990, Rogers' compensation was $4,439,180; petitioner's net taxable income after deducting Rogers' compensation was $2,432,253.  Thus, petitioner's net taxable income before deducting Rogers' compensation was $6,871,433.

$2,169,125, and $1,884,853 and 93, 91, and 103 percent of net taxable income of $923,690, $662,974, and $688,801 (before deducting officer's compensation at issue) for 1989, 1990, and 1991, respectively); Acme Constr. Co. v. Commissioner, T.C. Memo. 1995-6 (reasonable compensation was 10.2 percent of gross income of $4,330,871 and 73.23 percent of net taxable income of $603,771 (before deduction of compensation at issue in 1990); BOCA Constr., Inc. v. Commissioner, T.C. Memo. 1995-5 (reasonable compensation was 27.7 and 31.9 percent of gross receipts of $2,488,322 and $2,558,903 for 1989 and 1990, respectively, and approximately 80 percent of net income of $847,328 and $1,055,086 (not including the compensation at issue in each year).

In these cases cited by petitioner, this Court found that the compensation paid by the taxpayer was reasonable even though it was a large portion of the taxpayer's gross receipts and net income. However, petitioner fails to recognize that unlike the instant case where the compensation being challenged was paid to only one employee, Rogers, in Pulsar Components Intl., Inc., Mad Auto Wrecking, Inc., and BOCA Constr., Inc. the compensation at issue was paid to two officer/shareholders. Thus, the facts of those cases and the case at hand are clearly distinguishable.

Petitioner contends that a portion of the compensation paid Rogers in 1990 is for services he provided petitioner in prior years. Similarly, in Acme Constr. Co., the compensation was paid

in part to the officer/shareholder for services he performed in prior years. In that case, we found that the compensation was reasonable, notwithstanding the fact that it was 73.23 percent of net taxable income (before deduction of compensation at issue). However, as noted in Owensby & Kritikos, Inc. v. Commissioner, supra at 1326 n.34:

> the absolute probative value of compensation as a percentage of net income as an isolated factor is often minimal. The main reason for this is that this factor is dependent upon a variable--the company's income-- that, at least in the short run, may be unrelated to the value of an individual's services. For example, a company with a high income might pay unreasonable salaries to its shareholder-employees; yet that compensation as a percentage of net income would be low because of the company's high income. On the other hand, a company with low net income might pay virtually all of that income to its shareholder-employees in salaries that are unquestionably reasonable.

In Acme Constr. Co. the net taxable income was $603,771; in the case at bar the net taxable income is $6,871,433 (before deduction of the compensation at issue). The difference in magnitude of the respective companies' net incomes makes the comparison of the relevant percentages of limited probative value.

We find that in this case the large portion of net income paid in compensation to Rogers is a factor that points to the conclusion that the compensation paid was in part unreasonable.

5. General Economic Conditions

This factor helps to determine whether the success of a business is attributable to general economic conditions as

opposed to the efforts and business acumen of the employees. General economic conditions may affect a business' performance and indicate the extent (if any) of the employees' effect on the company. Mayson Manufacturing Co. v. Commissioner, 178 F.2d at 119-120. Adverse economic conditions, for example, tend to show that an employee's skill was important to a company that grew during the bad years.

At trial, petitioner presented expert witness testimony as to the reasonableness of Rogers' compensation. Expert witness testimony is appropriate to help the Court understand an area requiring specialized training, knowledge, or judgment. Fed. R. Evid. 702; Snyder v. Commissioner, 93 T.C. 529, 534 (1989). The Court, however, is not bound by an expert's opinion. We weigh an expert's testimony in light of his or her qualifications and with respect to all credible evidence in the record. Depending on what we believe is appropriate under the facts and circumstances of the case, we may either reject an expert's opinion in its entirety, accept it in its entirety, or accept selective portions of it. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994).

Petitioner's expert, Mr. James V. Hughes (Hughes), is an expert on compensation with Arthur Anderson & Co. Hughes testified at trial and submitted a report that he coauthored with Bruce K. Benesh (Benesh). Benesh did not testify at trial.

Petitioner's experts concluded that the compensation paid Rogers was reasonable. Hughes based his conclusion on various sources, one of which was relevant industry and compensation data. This data, according to Hughes and Benesh, describes the economic conditions in which petitioner operated from 1986 through 1990.

In their report, Hughes and Benesh provided data they gathered from the Tennessee Board of Licensing Health Care Facilities and the National Association for Home Care, Washington, D.C. The data shows that there were fewer licensed health care agencies in the State of Tennessee in each year after 1986. For instance, there were 379 licensed health care agencies in the State of Tennessee in 1986, 326 in 1989, and 320 in 1990. Hughes interpreted this data to indicate that the health care industry was "slowing down". Hughes and Benesh attributed this slowing down to the increasing Medicare paperwork and unreliable payment policies.

Petitioner's gross receipts, net income, and retained earnings have increased every year since 1986. It is evident that petitioner was able to take advantage of the business opportunities that arose in the consolidating industry. Hughes and Benesh attributed this ability to Rogers' business acumen and knowledge of the industry.

Although we agree that the data supports a finding that there were fewer health care agencies in the State of Tennessee in each year after 1986, we note that more than 98 percent of the

consolidation occurred between 1986 and 1989, and less than 2 percent of the consolidation occurred after 1989. Furthermore, Hughes and Benesh have provided no data on the status of the home health care industry in any of the other States in which petitioner does business.

Significantly, although Hughes and Benesh characterized the home care industry as "contracting", they provided no data that shows that the health care business actually was contracting, instead of consolidating. The data shows only that there were fewer home health care agencies, not that there were fewer dollars spent on home health care. In fact, due to the 1989 changes in the regulations governing reimbursements to home health care agencies by Medicare, payment for a greater number of services was allowed, which provided potential for increased revenue.[6] Thus, the data actually shows that each year there were fewer agencies operating in a business that had expanding

---

[6] At trial, Rogers gave the following testimony in response to petitioner's lawyer's questions:

Q. And as a result of the number of home health industries in the State of Tennessee, would you say that it was--

A. It was a free-for-all.

Q. --a competitive market?

A. It was a free-for-all.

Thus, Rogers did not characterize the business conditions as competitive. He chose, instead, to use a description that would not be unfamiliar to a 49'er participating in the California gold rush.

opportunities for greater revenues. Under these facts and circumstances, we do not assume that a consolidation phase is a per se adverse economic condition for a business.

Thus, petitioner's evidence does not support a finding that the home health care business suffered from adverse economic conditions, or that the home health care business was significantly more competitive in 1990 than it was in 1989. This factor points to the conclusion that the compensation paid Rogers in 1990 was in part unreasonable.

6. Comparison of Salaries Paid With Distributions of Retained Earnings

The failure to pay more than minimal dividends may suggest that reported compensation actually is (in whole or in part) a dividend. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1322-1323; Charles Schneider & Co. v. Commissioner, 500 F.2d at 151. Corporations, however, are not required to pay dividends. Shareholders may be equally content with the appreciation of their stock caused, for example, by the retention of earnings. Owensby & Kritikos, Inc. v. Commissioner, supra; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1162.

In reviewing the reasonableness of an employee's compensation, we often apply a hypothetical independent investor standard to determine whether a shareholder has received a fair return on investment after payment of the compensation in question. Owensby & Kritikos, Inc. v. Commissioner, supra at

1326-1327; Pulsar Components Intl., Inc. v. Commissioner, T.C. Memo. 1996-129. Rogers had sole discretion of whether to pay a dividend, and the amount thereof. Petitioner paid $1,500 in dividends in the year at issue. Although the amount of this dividend is a 150-percent return on the capital invested, it is insignificant in comparison to petitioner's earnings.

A corporation's dividend policies should not, however, be viewed in a vacuum. Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327. The Court should look at the total return the corporation is earning for its shareholders, the prime indicator of which is the return on shareholders' equity. Id.

> If, * * * the company's earnings on equity remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. [Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1247 (9th Cir. 1983), revg. T.C. Memo. 1980-282; fn. ref. omitted.]

Petitioner's shareholder's equity grew from $97,623 at yearend 1986 to $1,708,137 at yearend 1989 to $3,389,705 at yearend 1990.[7] Petitioner's total return on equity for the year at issue was 98.65 percent.[8] This return is impressive, and an

---

[7] In this case, shareholder's equity is the sum of Rogers' original capital investment, $1,000, plus retained earnings.

[8] Return on equity is calculated after deducting all amounts paid as compensation. Thus, total return on equity is the sum of the increase in shareholder's equity from yearend 1989 to yearend 1990 plus dividends paid in 1990, divided by shareholder's equity at yearend 1989.

independent investor would undoubtedly be satisfied with such a return.  This factor favors petitioner.

7.  Prevailing Rates of Compensation for Comparable Positions in Comparable Concerns

Respondent's regulations provide that "It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances."  Sec. 1.162-7(b)(3), Income Tax Regs.

Petitioner relied on its expert witnesses' testimony and reports for evidence on this factor.  Petitioner submitted a report written by Joe T. Fisher (Fisher), in addition to the one coauthored by Hughes and Benesh.

Petitioner's Experts' Reports

Although Fisher does not specialize in executive compensation, he is a member of the American College of Health Care Executives and has held various executive positions in the health care industry since 1977.  In his professional capacity Fisher has become familiar with the various incentive plans that have been administered through various health care companies, he has conducted studies and surveys of executive compensation, and he has participated in the design of executive compensation plans.  In his report, Fisher concluded that the amount of compensation paid Rogers in 1990 was reasonable.  Fisher's report, however, contains several inaccuracies that cause this

Court to discount his opinion. For instance, in his report Fisher stated that "Rogers personally designed and implemented a computer system for * * * [petitioner]", and that "Rogers was personally involved * * * in the day-to-day operations of * * * [petitioner] from the period of 1986 through 1990." Rogers, however, testified to the contrary.

Furthermore, although Fisher testified that he compared Rogers' compensation to that paid to others in comparable positions, he did not cite the sources for those comparisons in either his testimony or his report. Fisher's opinion does not appear to be based on verified factual data. Thus, we accord Fisher's opinion little weight. See Diverse Indus., Inc. v. Commissioner, T.C. Memo. 1986-84.

Petitioner's other experts, Hughes and Benesh, also submitted a written report. The report coauthored by Hughes and Benesh states, however, that they "were unable to locate any comparable survey data on home health care agency managers similar to * * * [petitioner]." Hughes and Benesh, therefore, were unable to perform a direct comparison. Nor were they able to identify individuals in a similar employment position, with similar experience, qualifications, knowledge, and responsibilities to those of Rogers. Despite these obstacles, Hughes and Benesh were able to create, in their opinion, a reasonable comparison by examining the specific functions

performed by Rogers and then comparing the compensation paid to Rogers with that paid to the person performing functions similar to those performed by Rogers. Thus, Hughes and Benesh first compared Rogers to a physician.

In comparing the compensation paid to Rogers to the compensation paid to a physician, Hughes and Benesh determined that Rogers' average annual compensation was approximately 18 percent of petitioner's total revenue, whereas for a physician the average median compensation-to-production ratio is 40 percent; and the compensation for a physician in the 90th percentile is 59 percent, which exceeds the percentage paid to Rogers in 1990.

In the alternative, Hughes and Benesh compared Rogers' position and compensation to that of a real estate sales agent. For this comparison, Hughes and Benesh relied upon data provided in a report entitled "Real Estate Profitability 1992", which was published by the National Association of Realtors. Hughes and Benesh found that the median compensation for real estate agents who are paid on a sliding scale starts at 55 percent of the commission paid by the sellers to the real estate broker and increases to 63 percent.[9] On the basis of these comparisons,

---

[9] Compensation on a sliding scale is based upon the notion that a salesperson will receive a larger portion of the commission as her total dollar volume of sales increases.

Hughes and Benesh determined that Rogers' compensation as a percentage of gross revenue was low.

We do not find Hughes and Benesh's opinion persuasive. For the evidence of comparable salaries to be accorded any weight, it must be shown that the salaried positions are actually comparable. Work responsibility, nature of operations, years in which the salary is paid, and even the local cost of living may be taken into account. See, e.g., Thomas A. Curtis, M.D., Inc. v. Commissioner, T.C. Memo. 1994-15; Diverse Indus., Inc. v. Commissioner, T.C. Memo. 1986-84; Snyder Bros. Co. v. Commissioner, T.C. Memo. 1980-275; Townsend v. Commissioner, T.C. Memo. 1980-264.

The similarity Hughes and Benesh found between a physician and Rogers was that both are in the health care business, and that Rogers performed his duties well with the support of several office professionals and nurses. Thus, they concluded that just as a medical practice cannot exist without a physician, without Rogers petitioner's supporting staff would not perform their duties and petitioner would not exist. This superficial comparison is specious and is accorded no weight.

Hughes' and Benesh's comparison of Rogers' compensation to that of a real estate agent is equally unpersuasive. In their report, Hughes and Benesh state that although real estate agents and Rogers perform similar functions in their jobs, e.g.,

research the market for prospective buyers and sellers, solicit business, provide consulting expertise, negotiate agreements with prospective clients, and assist with paperwork, Rogers' compensation as a percentage of petitioner's gross revenue is "much lower than the [real estate] agents' median commission", which is 55 to 63 percent of the commission paid by the seller to the real estate broker.

Petitioner's experts, however, ignore the fact that the industry publication that they relied upon for their data reports that the median amount of the net compensation paid to real estate sales agents in the South in 1992, who are compensated on a sliding scale, is approximately $31,000.[10] The amount of Rogers' compensation in 1990 was $4,439,180. Thus, although the amount of Rogers' compensation is more than 140 times greater than the median amount paid to persons who, according to Hughes and Benesh, perform comparable functions, Hughes and Benesh conclude that Rogers' level of compensation is comparatively low.

Previously, we stated that the absolute probative value of measuring compensation as a percentage of income is often minimal when used as an isolated factor. We do not find that the data

_____

[10] The report also states that the typical established real estate salesperson is a 49-year-old female who derives 67 percent of her household income from the practice of residential real estate brokerage. We have not given any weight to these differences between the typical real estate salesperson and Rogers.

relied upon by Hughes' and Benesh's report supports their conclusion. Hughes' and Benesh's total disregard of the actual amounts paid to those who, in their opinion, perform jobs requiring functions comparable to those required of Rogers is suspect. Thus, we find petitioner's experts' opinions of dubious value.

Respondent's Witness

Respondent chose not to rely upon an expert witness for an opinion and chose instead to rely upon Revenue Agent Horton to explain how he determined $400,000 was the reasonable amount of compensation for petitioner to pay Rogers. Horton is not an expert on compensation. Horton based his determination of the compensation that would be reasonable upon his experience as an IRS agent, and some general statistics on the average compensation paid to an officer of a business of approximately the same size as petitioner. There is no evidence that Horton based his determination on the prevailing rates of compensation for comparable positions in comparable concerns. Therefore, we accord Horton's testimony regarding this factor no weight. This factor favors neither party. We consider it neutral.

8. Salary Policy of Petitioner as to All Employees

Courts have considered salaries paid to other employees of a business in deciding whether compensation is reasonable. Kennedy v. Commissioner, 671 F.2d at 173; Home Interiors & Gifts, Inc. v.

Commissioner, 73 T.C. at 1159. We look to this factor to determine whether Rogers was compensated differently than petitioner's other employees solely because of his status as a shareholder.

Petitioner deducted total compensation of $6,075,444 in 1990. As a percentage of total compensation paid, Rogers received 73 percent, even though he constituted less than 2 percent of petitioner's employees.[11] Furthermore, of the total compensation paid to petitioner's seven key employees (including Rogers), $5,162,018, or 85.99 percent, was paid to Rogers.[12] Moreover, the compensation of the highest paid nonshareholder, Worley, was 5.1 percent of the amount paid to Rogers. The disparity between the compensation paid to the nonshareholders and that paid to the shareholder--Rogers--is patent. Further exploration of this situation is required.

Contingent compensation paid under a longstanding arm's-length agreement will usually be upheld even if an incentive formula results in greater compensation than the parties anticipated at the time they entered into the contract. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1327, 1328;

---

[11] Thus, Rogers' compensation was almost three times greater than the total compensation paid to all of the other employees.

[12] Thus, Rogers' compensation was more than six times the total amount paid the other key employees.

Elliotts, Inc. v. Commissioner, 716 F.2d at 1248; Kennedy v. Commissioner, supra at 174. Rogers' bonus formula was established in the corporate minutes at the beginning of 1989.[13] Thus, the bonus formula was not longstanding. Cf. Mayson Manufacturing Co. v. Commissioner, 178 F.2d at 120 (bonus contracts basically unchanged since they were negotiated in 1929, held reasonable for taxable year 1943). Rogers is the 100-percent shareholder of petitioner, its director, and its president. Rogers alone determined the salary and bonus compensation of every employee, including himself. Thus, Rogers and petitioner were not dealing at arm's length. See Estate of Wallace v. Commissioner, 95 T.C. at 555; cf. Mayson Manufacturing Co. v. Commissioner, supra at 121 (bonus plan established by board of directors for minority shareholders was an arm's-length transaction). Where an employer and employee are not dealing at arm's length, the amount of compensation may be unreasonable. Owensby & Kritikos, Inc. v. Commissioner, supra at 1324; Elliotts, Inc. v. Commissioner, supra at 1246.

Petitioner notes on brief that respondent previously reviewed the bonus formula in the examination of petitioner's 1989 return. The result of that examination was a $211 refund, and no adjustment was proposed to the deduction for compensation

---

[13] In 1989, Rogers' base salary was $500,000; in 1990 it was $1 million. In both years, the bonus formula was 50 percent of pretax profit.

by petitioner.  Petitioner contends this fact is of particular importance in this case.

Contrary to the position of petitioner, we do not find that the fact respondent chose not to assert deficiencies in the prior examination is necessarily important, or that it indicates that the IRS accepted the manner in which compensation was determined. See Owensby & Kritikos, Inc. v. Commissioner, supra at 1329; cf. Mayson Manufacturing Co. v. Commissioner, supra at 121 (commission contract approved and accepted by the Commissioner over a period of a number of years).  We note that Rogers was paid total compensation of $928,883 in 1989, compared to $4,439,180 in 1990.  The dramatic increase raised the stakes involved and thereby increased respondent's incentive to challenge the payments.  Owensby & Kritikos, Inc. v. Commissioner, supra at 1329 n.57.

The great disparity between the amounts paid to the nonshareholders and the sole shareholder--Rogers--and the fact that Rogers' compensation plan was not the result of a longstanding arm's-length agreement point to the conclusion that the compensation paid Rogers in 1990 was in part unreasonable.

9.  Amount of Compensation Paid to Rogers in Previous Years

We note at the outset that respondent concedes on brief that the maximum reasonable compensation for Rogers in 1990 is $1,837,821.  Respondent arrived at this amount by calculating the

percentage of gross receipts that Rogers received as compensation in 1989--18.6009 percent--and applying that percentage to petitioner's 1990 gross receipts.  Petitioner contends that, although Rogers' compensation in 1990 was 44.9 percent of that year's gross receipts, it is reasonable because when the 1990 percentage is averaged with the prior years' percentages, the average percentage is 18.84 percent, which is almost the same percentage as the compensation respondent allowed in 1989.[14]

Thus, petitioner argues that the compensation paid Rogers in 1990 was, in part, paid to compensate him for undercompensation in earlier years.  Respondent counters that in making this argument petitioner, in effect, is seeking to deduct in 1990 compensation for services performed by Rogers in prior years.

---

[14]  Rogers' compensation in 1986, 1987, 1988, 1989, and 1990 measured as a percentage of petitioner's gross receipts in each of those years is 7.8, 6.0, 16.9, 18.6, and 44.9 percent, respectively.  The average of the percentages is 18.84 percent.

We find, however, that petitioner's argument on this point is flawed.  From 1986 through 1990, petitioner paid Rogers $5,942,622, and petitioner's total gross receipts for the same period were $19,462,685.  Thus, the total compensation paid to Rogers as a percentage of petitioner's total gross revenue is 30.53 percent.

If it was actually petitioner's intent to compensate Rogers in 1990 for his service in the prior years by paying him 18.6 percent of the gross receipts it earned in those years, petitioner would have paid Rogers $2,116,618.  This amount is the total of 18.6 percent of each prior year's gross receipts less the amounts petitioner actually paid to him for each of those years, plus 18.6 percent of petitioner's 1990 gross receipts. ((18.6% x $848,403) - $66,943) + ((18.6% x $1,196,849) - $75,914) + ((18.6% x $2,542,912) - $431,702) + ((18.6% x $4,993,761) - $928,883) + (18.6% x $9,880,760).

Respondent correctly acknowledges that it is well settled that under some circumstances, reasonable additional compensation of officers for services rendered in prior years is deductible from the corporation's income for the year in which paid. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930). However, a taxpayer claiming that part of the payment to an officer in the current year is for services rendered for prior periods must show: (1) The insufficiency of the officer's compensation in the previous year, and (2) the amount of the current year's compensation that was intended as compensation for that underpayment. Pacific Grains, Inc. v. Commissioner, 399 F.2d at 606; Estate of Wallace v. Commissioner, supra at 554; Pulsar Components Intl., Inc. v. Commissioner, T.C. Memo. 1996-129. We have found as a fact that the $500,000 increase in Rogers' base salary was intended to compensate him for service in prior years. Therefore, it is only the first prong that is at issue.

Respondent denies that Rogers was undercompensated in prior years. In support of his position, respondent notes that in 1986, Rogers' compensation was very nearly one-half of petitioner's taxable income, and that in 1988 and 1989, it was more than one-half. Moreover, respondent argues that as petitioner paid Rogers more than $1.5 million over those 4 years, Rogers could not have been undercompensated.

In 1984, Rogers rejected a job that offered to pay him in excess of $1 million a year to manage a home health care division. Instead, Rogers went to work for petitioner in 1986, managing its home health care business. Petitioner paid Rogers $66,943, $75,914, $431,702, and $928,883 in 1986, 1987, 1988, and 1989, respectively. It is evident, therefore, that Rogers was underpaid in each of those 4 years.

Thus, we find that petitioner has met its burden of proving that part of the compensation paid Rogers in 1990 was intended to compensate him for services he performed prior to 1990.

Conclusion

We come to the point where we must use our best judgment, after weighing the evidence, to reconcile and integrate the factors discussed above and reach our ultimate conclusion. Because of all the factors and circumstances here present, we have given the issue herein a close scrutiny with the result that we agree with neither petitioner nor respondent. On the basis of our examination of the entire record we hold that $2.3 million constituted reasonable compensation to Rogers for personal services rendered to petitioner in 1990 and prior years.

Issue 2. Accuracy-Related Penalty Under Section 6662

Respondent determined an accuracy-related penalty under section 6662 against petitioner for 1990 equal to 20 percent of the tax deficiency.

Section 6662(a) provides that if any portion of an underpayment of tax is attributable to any one of the factors listed in section 6662(b), then there shall be added to the tax an amount equal to 20 percent of the amount of the underpayment to which it is so attributable. Petitioner has the burden of proving that respondent's determination of the penalty is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

Petitioner did not address the section 6662 penalty issue at trial or on brief. Therefore, it failed to carry its burden of proof, and we sustain respondent's determination of the penalty for 1990.

To reflect the foregoing,

Decision will be entered

under Rule 155.